In the Matter of the Compensation
of the Beneficiaries of
BROWN, deceased,
*Petitioners,*

*v.*

STATE ACCIDENT INSURANCE FUND, et al,
*Respondents.*

(WCB No. 77-5958, CA 14853)

602 P2d 1151

James H. Marvin, Portland, argued the cause for
petitioners. With him on the brief was Schouboe, Marvin & Furniss, P.C., Portland.

Darrell E. Bewley, Salem, argued the cause for
respondent State Accident Insurance Fund; Ridgway

[447]

K. Foley, Jr., Portland, argued the cause for respondent Flightcraft, Inc. With them on the brief were James D. Huegli and Souther, Spaulding, Kinsey, Williamson & Schwabe, Portland.

Before Tanzer, Presiding Judge, and Thornton and Campbell, Judges.

CAMPBELL, J.

**CAMPBELL, J.**

In this workers' compensation proceeding, claimant, the widow of John I. Brown (Brown), appeals from an order of the Workers' Compensation Board (Board) affirming the referee's order denying compensation on the basis that Brown's death did not arise "out of and in the course of [his] employment," ORS 656.005(8)(a). We affirm.

Brown died from injuries sustained in a plane crash, the circumstances of which are explained more fully below. Brown had been employed at Flightcraft, Inc. (Flightcraft) since August 1, 1974, as a charter pilot. During the time he was employed there, Brown and David Lees formed the Brown-Lees Corporation (Brown-Lees) for the purpose of purchasing a new 1975 Beechcraft Baron twin-engine plane. In late 1976, Brown-Lees entered an agreement with Flightcraft whereby the plane was leased to Flightcraft at a rate of $82 per hour of flight time. Under this contract, Brown-Lees was to bear the cost of maintenance necessary to conform to FAA standards, and of all operating and fixed costs of the plane, including gasoline. The owners of the Baron were entitled to make personal use of the plane by signing it out from Flightcraft as would any other renter. Brown periodically used the Baron for personal business.

Flightcraft used the Baron primarily for charters, demonstrations, and rental to third parties. Although Brown often piloted the plane due to personal preference, Flightcraft frequently assigned other pilots in its employ to pilot the Baron. Similarly, Brown routinely was dispatched to pilot other aircraft operated by Flightcraft.

From the time the plane left the factory, a screw designed to hold down a maintenance inspection panel on the wing was stripped, causing that panel to vibrate during flight. It is uncontroverted that this problem was merely cosmetic and did not affect the airworthiness of the plane. On May 1, 1977, claimant had

[449]

pointed out the loose panel to Brown during a personal flight. On May 22, 1977, Brown and James Gordon Miller, another Flightcraft pilot, flew the Baron on a round-trip charter flight from Portland to Vancouver, British Columbia, and back. Following the flight, one of the passengers commented to Miller on the loose panel. The vibration of the panel had worsened due to the loosening of other bolts holding it down.

Prior to landing at Portland Airport at 6:30 p.m. on the return leg of the Vancouver, B.C., round-trip, Brown had told Miller of his plan to drive his pickup truck home to Vancouver, Washington, after work so that he could stop on the way to buy some curds and whey for his pigs. Sometime after making this statement, Brown told Miller, in reference to the loose panel on the wing, "Well, I am going to finally have to fix it now that the other bolts have come out."

After landing in Portland, Brown was advised for the first time that he was scheduled to fly the Baron from Portland to Redmond early the next afternoon to pick up some passengers. He then apparently changed his plans and decided to fly the Baron to Evergreen Airport in Vancouver, Washington, where he maintained a tie-down for the Baron. The airport is adjacent to his home. On his landing approach to Evergreen Airport, the Baron struck some tree tops and crashed, causing Brown's fatal injuries.

Claimant contends that Brown's death arose out of and in the course of his employment. She argues that the evidence shows that Brown flew the Baron home that night to repair the loose panel on the wing and to refuel the plane and, therefore, his death is compensable. At the hearing, she testified that she was unaware of any time that Brown flew the plane home that he did not do some work on it. She also testified that Brown frequently bought fuel at Evergreen Airport because the price there was lower than at Flightcraft. There was other testimony to the effect that Brown was licensed by the FAA to do air frame and power

lant maintenance on aircraft, and often performed minor maintenance on the Baron.

Jerome Dilling, Flightcraft's flight administrator, was aware that Brown performed minor repairs on the plane, and acquiesced in the practice. He stated:

" * * * The whole idea of maintaining the airplane is such we allow him to do minor maintenance on the airplane because it was to the benefit of him not to pay our shop whatever the going rate is for shop work. Therefore, it was his benefit to maintain the airplane to economize, so to speak, as I heard the word earlier."

Dilling emphasized, however, that Brown was neither required nor expected by Flightcraft to do such minor repairs. There was testimony from claimant and her son that Flightcraft always performed the 100-hour checkup on the Baron, and that there were maintenance procedures for which Brown was not qualified and that Flightcraft would not let him perform. Brown was not permitted to do repair work on the plane in Flightcraft's shop. On the night in question, Flightcraft's shop was closed and thus unavailable to do the repair work on the wing of the plane.

Dilling testified that Brown was expected to keep the Baron airworthy for flights for which it was scheduled. He stated, however, that Brown was not necessarily required to keep the airplane airworthy on an immediate on-call basis, and that Flightcraft had between 30 and 40 other aircraft available for charter flights. Another plane was substituted for Brown's Baron on May 3, 1977, on the scheduled flight to Redmond. Before each flight, it was the responsibility of the pilot in command of that flight to inspect the aircraft for airworthiness.

There was testimony that Brown's driving time between Portland Airport and home was approximately 20-40 minutes, depending on traffic conditions. Flying time from Portland Airport to Evergreen Airport was two to three minutes. There was also testimony

[451]

that the plane needed more fuel to make the flight to Redmond.

The Board stated that it found no evidence that Brown flew the Baron home on May 2, 1977, to refuel the plane at Evergreen Airport or to perform repairs on the wing. It concluded that the use of the plane was explainable by the relative lateness of the end of Brown's working day and his desire to avoid traffic and shorten his travel time. The Board ruled, therefore, that Brown's death was not compensable. In the alternative, the Board ruled that even assuming that Brown intended to work on the Baron that night, such activities were related to the business of Brown-Lees and not to that of Flightcraft.

Although we find evidence to support claimant's contention that Brown flew the plane home May 2, 1977, intending to perform repairs on it, we concur with the referee and the Board that the fatal flight did not arise out of Brown's employment.

In *Gumbrecht v. SAIF*, 21 Or App 389, 534 P2d 1189 (1975), the court stated the general rule where an employee is injured returning home from work:

" * * * [I]njuries sustained by employees when going to and coming home from their regular place of work are not deemed to arise out of and in the course of their employment. * * * " 21 Or App at 392, *quoting from Philpott v. State Ind. Acc. Com.*, 234 Or 37, 40, 379 P2d 1010 (1963).

Claimant here attempts to fit within the 'dual-purposes' exception to the general rule, which has been summarized as follows:

"The basic dual-purpose rule, accepted by the great majority of jurisdictions, may be summarized as follows: when a trip serves both business and personal purposes, it is a personal trip if the trip would have been made in spite of the failure or absence of the business purpose and would have been dropped in the event of failure of the private purpose, though the business errand remained undone; it is a

[452]

business trip if a trip of this kind would have been made in spite of the failure or absence of the private purpose, because the service to be performed for the employer would have caused the journey to be made by someone even if it had not coincided with the employee's personal journey." 1 Larson, Workmen's Compensation Law § 18.12 at 4-218 (1978).

Larson explains the application of this rule to cases where an employee is injured on his way home while performing services for his employer:

" * * * In all such cases, we start with a personal motive—that of getting home—which would have caused the employee to take the trip in any case. The question then becomes: was the business mission of such character or importance that it would have necessitated a trip by someone if this employee had not been able to handle it in combination with his homeward journey?" 1 Larson, Workmen's Compensation Law § 18.21 at 4-238-4-239 (1978).

This rule has been followed in Oregon. *See Munson v. State Ind. Acc. Comm.*, 142 Or 252, 20 P2d 229 (1933); *Lumbrecht v. SAIF, supra.*

There is no contention here that Flightcraft would have dispatched another pilot to fly the Baron to Evergreen Airport for refueling or minor repairs had not the trip coincided with Brown's trip home. Further, it does not appear that, absent the incentive to economize on fuel and minor repairs due to the responsibility of Brown-Lees for these costs, Brown would have desired to refuel or perform repairs himself at Evergreen Airport.

We hold that Brown's death does not fall within an exception to the "going and coming" rule and is, therefore, noncompensable.

Affirmed.